ALEXEI SCHACHT
ATTORNEY AT LAW
123 WEST 94TH STREET
NEW YORK, NEW YORK 10025
TEL: (646) 729-8180
FAX: (212) 504-8341
alexei@schachtlaw.net
www.schachtlaw.net

September 16, 2021

**BY ECF**

The Honorable Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States of America v. Victor Rojas-Bascope, 19 Cr. 91 (DLC)*

Dear Judge Cote:

    This Sentencing Submission is respectfully submitted on behalf of Victor Rojas-Bascope ("Victor", "Mr. Rojas" or "the defendant" herein) to aid the Court in determining the appropriate sentence in this case.

    As the Submission discusses in detail, we believe that based upon all of the facts and circumstances in the case a sentence primarily of 120 months, to be served concurrently with the 70-month sentence he is already serving from his case in the Southern District of Florida, is fair, reasonable and just.

**THE KEY FACTS IN THIS CASE**

    Victor Rojas pleaded guilty to being a member of a conspiracy, that lasted between about 2017 and 2019, to import cocaine into the United States. Victor's brother Ruben Rojas-Bascope is also charged in this case, but he is now living in Bolivia which does not currently extradite its citizens to the United States.[1] Victor already pleaded guilty and was sentenced to 70 months for

---

[1] The main reason for this is that former Bolivian President Gonzalo Sanchez de Lozada, a former United States ally, is charged with committing genocide against indigenous people in Bolivia. He now lives openly in the United States and the United States has refused to extradite him. Sanchez de Lozada fled Bolivia after scandals involving mass murder sanctioned by him and corruption allegations against him; current President Evo Morales was elected shortly afterward he fled.

being a member of a conspiracy, along with his brothers Ruben Rojas-Bascope and Juan Rojas-Bascope, to launder drug proceeds from about 2014 to 2019.

Victor Rojas is now 50 years old. In the 20 years prior to his arrest he worked primarily as a full-time parking garage attendant and garage manager, mainly in New York City. As discussed in the Presentence Investigation Report ("PSI"), he has 6 older siblings, two of whom are Ruben and Juan.

The way that Victor became involved in the drug and money laundering business is that his older brother Ruben, who was already an experienced narco-trafficker, asked Victor (who lived in the United States and worked legally), to help send money to Ruben in Bolivia. Victor agreed to do this and using his own bank accounts in his own name primarily deposited drug proceeds belonging to his older brother Ruben (or customers of his) and sent them by wire transfer to Ruben in Bolivia. Victor's brother Juan also participated in this same money-laundering conspiracy, the facts of which formed the basis for the Miami case. In connection with the sentencing in Miami, the parties agreed, and the Court found, that Victor had a minor role in that offense. The parties in Miami jointly recommended (Exhibit A) that he be sentenced concurrently with the sentence in this case.

Unknown to Victor, federal law enforcement officials in New York were investigating at the same time that the Miami investigators were tailing Victor. The current New York case stems from a scheme (described in the PSI) to try to sell 1500 kilograms to some informants. The initial impetus for this New York case was that codefendant Percy Arturo Vasquez-Drew was a drug trafficker in Bolivia who said to these informants that he had access to large supplies of cocaine. Vasquez-Drew and other codefendants in Bolivia, including Ruben, were to supply the drugs. Plainly Victor had the smallest role of all of the defendants discussed in the PSI. He was a parking garage attendant in New York who worked for his older brother and foolishly agreed to launder drug money in his own accounts in his own name. In other words, he was not a smart and sophisticated narco-trafficker but was willingly and foolishly used by his brother to "do the dirty work" in New York and take the risk of being arrested in the United States. And Victor did all of this for very little money, making a thousand dollars here or $500 there running these criminal errands for Ruben.

Indeed, it seems that Victor did not even know the scope of the crime that he was committing. The evidence in the case includes recordings of many meetings, the key one of which in Victor's case was made in New York when he accepted the money from the informant to buy the drug sample. In that recorded meeting, Victor asked the informant how much drugs he was buying from the suppliers in Bolivia. Victor would never have done that had he known; he needed to be told by the informant what the scope of the deal was as the actual co-conspirators did not see fit to tell him. In any event, his role was to act as a messenger or mule or gopher. He was not a supplier and had no ability to negotiate or even discuss prices or quantities. In short, his role was less than Vasquez-Drew who received a ten-year sentence. Indeed, the Government essentially pointed out in connection with Vasquez-Drew's sentencing that Victor is less culpable Vasquez-Drew (*see* pages 3-5 of the Government letter that is docket entry 47).

While Victor and his brothers and other co-conspirators were being investigated separately by Miami and New York, agents from Miami approached Victor (see PSI paragraph 23 which inaccurately captures these events) and told him that he was being investigated for drug money-laundering. what happened next is extremely important and a main reason why the defendant deserves the lowest possible sentence.

The Miami agents allowed Victor to go to South America to try to convince his brother

Ruben to cooperate and surrender. Victor attempted to do this but failed. However, he did return to the United States and was then prosecuted in Miami and New York although he knew that he was subject to arrest and prosecution. Indeed, Victor could have stayed in Bolivia, like Ruben, from which he would never be extradited, at least for the foreseeable future.

In any event, he returned and pleaded guilty in Miami and New York, accepting full responsibility for his crimes. The Government in Miami attempted to get the New York prosecutors to agree to a Rule 20 transfer, either to New York or Miami, but New York refused. I believe that this was seen in Miami as an attempt to try to reach a fair outcome for Victor who tried to help the Government and returned and did not flee. A Rule 20 transfer would have guaranteed him concurrent time in the two cases and made him safety valve eligible.[2] In the event, pursuant to the PSI, the defendant's total offense level is 33 and he is in Criminal History Category II; therefore, the defendant's suggested sentencing guideline range is 188 to 235 months.

**THE ESSENTIAL LAW REGARDING SENTENCING**

Courts are largely unlimited as to the source or kind of information they may consider in sentencing a defendant so long as that information bears upon determining the proper sentence. **United States v. Carmona**, 873 F.2d 569, 574 (2d Cir.1989); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4. In that vein, courts are required to impose a "sufficient" sentence but "not [one] greater than necessary" to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a).

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors, among others:

(a) The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553[a][1]);

(b) The kinds of sentences available (§ 3553[a][3]);

(c) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553[a][6]); and

(d) The need to provide restitution to any victims of the offense. (§ 3553[a][7]).

The directives of **United States v. Booker**, 543 U.S. 220 (2005) and § 3553(a) make clear that courts should not uncritically apply the guidelines. Such an approach would be inconsistent with the holdings of the merits majority in **Booker**, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in **Booker**, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore. **United States v. Ranum**, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005)(Adelman, J.).

---

[2] The Government determined (and we agreed in the plea agreement) that even though all of Victor's crimes were committed at his brother's behest and were quite similar in nature, that because there was a temporal break between the acts that Victor committed, and since some of the other players in the crimes differed, that safety valve was not applicable. *See* U.S.S.G. § 4A1.2.

Here, we ask the Court to begin its sentencing analysis by determining the appropriate guideline range for the defendant considering his conduct. We ask that your Honor then compare the defendant's case to that of his already sentenced codefendant in the New York case and to defendants in other cases. After determining the defendant's advisory guideline level, comparing Mr. Rojas' case to other relevant defendants' cases, the court must decide whether to sentence the defendant to a non-Guidelines term of imprisonment. Judged by the appropriate legal standards, the facts in this case justify a non-Guidelines sentence of 120 months. So we next turn to an analysis of these factors.

**ANALYSIS OF THE SENTENCING FACTORS UNDER 18 U.S.C. 3553(a)(1)**

(a) *The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553[a][1]):*

The defendant is guilty of serious criminal activity. But in this case he never actually possessed, let alone, sold even one gram of illegal drugs. This fact ought to be considered in sentencing. So too should the fact that Victor took direction from his older brother and did not even know the full scope of the attempted crime until the informant told him. Victor had no decision-making authority and he recruited no one else into the conspiracy. Victor really was a money-laundering mule for his brother (the Miami case) who was later enlisted to participate in this failed drug deal (the New York case). He did not have any source of drug supply himself and was doing his money laundering on the side while working legally; his brother paid him little money to take the huge risks that he did and now he finds himself here in an enormous amount of trouble.

In this vein, the defendant has repeatedly expressed to me his remorse over committing these crimes and tells me he hopes to return home as soon as possible to live out his life in tranquility and domestic harmony. I trust he will tell your Honor in person about these same types of feelings when he is sentenced.

Victor has also told me how awful was his time in jail, in particular during the worst days of the pandemic. He will also talk about this at sentence. Mr. Rojas certainly never again wants to experience these horrors.

(b) *The kinds of sentences available (§ 3553[a][3]):*

The Court must sentence the defendant to an additional term of prison.

(c) *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553[a][6]):*

The Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Before **Booker**, the then-mandatory Sentencing Guidelines effectively foreclosed any consideration of this sentencing factor unless the Guidelines had not 'adequately' taken the circumstances into consideration." **United States v. Doe**, 412 F. Supp. 2d 87, 91 (D.D.C. 2006).

"Now that the Guidelines are advisory, however, judges are free—and perhaps required—to take account of sentence disparities when devising a punishment for a particular offender." *Id.* (emphasis added), *see also* **Kimbrough v. United States**, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities—along with other § 3553(a) factors—when imposing sentences.

While all cases are different and all defendants within a case are different, this principle of non-disparate sentencing is an important one and we believe that it should be invoked. A variance down to 120 months is appropriate because the codefendant Vasquez-Drew received a 120-month sentence and he was more or certainly no less culpable than my client. And a greater sentence for Mr. Rojas would violate the concept that similarly situated defendants should be treated the same. Indeed, if he were safety valve eligible my client should receive a lower sentence than Vasquez Drew.

I also ask that the principal of proportionate sentencing be invoked across cases. For example, another judge in this District previously sentenced a long-term drug dealer who did not receive a 5K motion to no jail time at all even though he had sold drugs for years. (*See* **United States v Bruce Rosenblum**, 11 CR 674(NRB) (the transcript is attached as Exhibit B). Similarly, in **United States v. Jose Toro Naranjo**, 18 CR 109 (NRB)(the transcript is attached as Exhibit C), the defendant was convicted of two separate cases comparable to this one, in Miami and New York, (which were combined under Rule 20 and he received safety valve treatment) and received a sentence of 78 months.

### (d) The need to provide restitution to any victims of the offense. (§ 3553[a][7]):

The PSI does not recommend that restitution be paid to any victims and we urge the Court to adopt this finding.

## THE DEFENDANT'S LIFE IN JAIL SO FAR

The Court is aware of the horrendous conditions which inmates have had to suffer during the COVID-19 pandemic. The defendant has told me that in the last two years he has suffered through 23-hours a day lockdowns and oftentimes constant isolation. This has caused him mental strain that cannot be overstated.

Because of conditions like these, judges in this District have acknowledged that the conditions in jail during this COVID-19 pandemic constitute extreme punishment beyond what the law requires and that the trauma experienced by an inmate as a result of pandemic-related isolation and fear of infection in jail can be the basis for a lower sentence. *See e.g.*, **United States v. Matute**, 16 Cr. 809(VM)(S.D.N.Y. Sept. 11, 2020). Indeed, this year courts in this district have granted downward variances at sentencing on the basis of the harsh conditions at local detention facilities both before and during the coronavirus pandemic. *See, e.g.*, **United States v. Paez Vazquez**, 20 Cr. 28 (JPO) (sentence of time served, approximately six months, despite Guidelines range of 87 to 108 months, taking into account difficult conditions at the MCC during the COVID-19 pandemic); **United States v. Morgan**, 19 Cr. 209 (RMB) (considering awful conditions at MDC before and during COVID-19 pandemic and imposing sentence of time served, less than 15 months, where stipulated Guidelines range was 33-41 months and actual applicable Guidelines range was 41-51 months); **United States v. Casillas**, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (time-served sentence

of approximately five months where Guidelines range was 15-21 months, in part based on conditions at MCC during the pandemic).

We ask that your Honor consider in its sentence calculation the jail conditions through which the defendant has suffered.

## THE DEFENDANT'S PROSPECTS FOR THE FUTURE

The defendant has a wonderful work ethic and history of legitimate employment. His family testify to his love and support for and by his relatives. There is every reason to believe that he will be able to be a productive member of Bolivian society once he is deported.

Victor is also blessed to have the love and support of many members of his family (please see the letters that will be submitted under separate cover) and this love and support will help to ensure that he does not again get into trouble when he is released from jail. Victor has also sought to make the most of his time in jail, although it has been difficult during the pandemic, but attached are two programs in which he has participated in jail (Exhibit D).

As mentioned above, Victor has suffered in jail. He has "learned his lesson" I believe, and while I cannot guarantee the future he seems like he has a strong chance to not again be a recidivist.

## CONCLUSION

For all of the foregoing reasons we believe that a sentence of 120 months to be served concurrently with his Miami case is fair, reasonable and appropriate in this case. Moreover, additional punishment would hardly serve any of the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Alexei Schacht*

Alexei Schacht

cc:    United States Attorney (by ECF)