

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 19, 2021

<u>Via ECF</u>

Honorable Denise L. Cote
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Victor Rojas-Bascope*, S1 19 Cr. 91 (DLC)

Dear Judge Cote:

    The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for September 23, 2021, at 3:00 p.m., on the defendant's conviction of conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Section 963.  The defendant, seeking to capitalize on the DEA's expulsion from Bolivia, laundered funds in service of a conspiracy to import thousands of kilograms of cocaine into the United States.  Accordingly, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 188 to 235 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.  The Government also submits that the Court should impose forfeiture in the amount of $45,000, and a fine within the Guidelines range of $40,000 and $10 million.

## BACKGROUND

**I.**    **Bolivia: A Major Cocaine Production and Transshipment Hub**

    In 2006, Evo Morales — a former coca farmer and coca union leader — became Bolivia's first indigenous president.[1]  Two years later, in 2008, the Bolivian government expelled the U.S. Drug Enforcement Administration ("DEA") and the State Department following tensions relating to, among other things, U.S. anti-narcotics policies in the region.  Since that time, cocaine traffickers in Bolivia have acted with impunity, increasing cocaine production in-country and also acting as a transit point for cocaine manufactured in Peru, headed toward

---

[1] CIA World Factbook: Bolivia, *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/bl.html.

Brazil and then for international distribution.[2]  Indeed, Bolivia's "position at the heart of South America's drug trade and weak, corrupt security forces [] facilitate Bolivia's role as a key transit nation for narcotics heading to Brazil, Argentina, Europe and Asia."[3]  While most of the cocaine imported into the United States originates in Colombia, Bolivia and Peru also account for the drug's ubiquitous presence in our country.[4]

Recognizing Bolivia's centrality in the global cocaine supply chain, the United States, in August 2019, identified Bolivia as "a major drug transit or major illicit drug producing" country, along with others such as Colombia, Afghanistan, Venezuela, and Mexico.[5]  The United States further singled out Bolivia, alongside the illegitimate regime of Nicolás Maduro Moros in Venezuela, as failing to adhere to their obligations under international counter-narcotics agreements.[6]  In 2019, and then again in 2020, the U.S. State Department identified Bolivia as the third-largest producer of cocaine in the world.[7]  While the ouster of President Evo Morales in November 2019 has been viewed as a positive step for the country, the Bolivian government and FELCN, its purported anti-narcotics force, remain rife with corruption.  Indeed, Morales' resignation has reportedly "created a power vacuum"[8] in the country, which is likely to lead to further instability and a continued rise in cocaine exports.

---

[2] *See, e.g.*, Wall Street Journal (Nov. 19, 2019): Morales Made Bolivia a Narco State, *available at* https://www.wsj.com/articles/morales-made-bolivia-a-narco-state-11574018858.

[3] InSight Crime: Bolivia Profile, *available at* https://www.insightcrime.org/bolivia-organized-crime-news/bolivia/

[4] Business Insider (Sep. 14, 2017): Here's how drugs are getting smuggled from South America to the US, *available at* https://www.businessinsider.com/heres-how-drugs-are-getting-smuggled-from-south-america-to-the-us-2017-9 ("Much of the cocaine from the region — Colombia, Bolivia, and Peru are the world's biggest producers — travels to the US, plying sea and air routes in the eastern Pacific and Caribbean, as shown by the map below, which was prepared by US Southern Command and displayed at the hearing.").

[5] *See* Memorandum on the Presidential Determination on Major Drug Transit or Major Illicit Drug Producing Countries for Fiscal Year 2020; *available at* https://www.whitehouse.gov/presidential-actions/memorandum-presidential-determination-major-drug-transit-major-illicit-drug-producing-countries-fiscal-year-2020/.

[6] *Id.*

[7] *See, e.g.*, State Department: 2020 International Narcotics Control Strategy Report, *available at* https://www.state.gov/wp-content/uploads/2020/06/Tab-1-INCSR-Vol.-I-Final-for-Printing-1-29-20-508-4.pdf ("Colombia remains the world's largest producer of coca and cocaine, followed by Peru and Bolivia, respectively.").

[8] Washington Post (Nov. 13, 2019): How Evo Morales Fell and Plunged Bolivia Into Chaos, *available at* https://www.washingtonpost.com/business/energy/how-evo-morales-fell-and-plunged-bolivia-into-chaos/2019/11/12/ff91d332-05a9-11ea-9118-25d6bd37dfb1_story.html

## II.   The Offense Conduct

In response to this pervasive cocaine production and trafficking, the Bilateral Investigations Unit of the DEA's Special Operations Division began to target Bolivian drug traffickers in approximately 2017.  By April 2018, the DEA—and in particular two confidential sources ("CS-1," and "CS-2," together the "CSes")—had established contact with the defendant and his co-conspirators and the parties agreed that the defendant and his brother would launder millions of dollars to further the importation of thousands of kilograms of cocaine into the United States.

Starting in May 2017, the DEA recorded meetings between the CSes and a Bolivian cocaine facilitator named Percy Vasquez-Drew ("Vasquez-Drew").  PSR ¶ 13.[9]  Vasquez-Drew told the CSes that he could provide thousands of kilograms of Bolivian cocaine, and he could assist them in transporting the cocaine from Bolivia to the U.S., via either military or commercial aircraft.  The CSes requested a five-kilogram sample of cocaine (the "Cocaine Sample") from Vasquez-Drew, which the CSes indicated would be provided to customers in New York City.  *Id.*

In April 2018, the CSes met in Bolivia with Vasquez-Drew, who introduced Osvaldo Londono-Vanegas ("Londono") as his cocaine supplier.  PSR ¶ 14.  The CSes met again with Vasquez-Drew and Londono in Bolivia on several occasions in April 2018.  *Id.* at ¶¶ 14, 15.  During one of the April 2018 meetings in Bolivia, Vasquez-Drew introduced the CSes to the defendant and his brother, Ruben Rojas-Bascope.  *Id.* at ¶ 15.  During these April 2018 meetings, the parties discussed the logistics for a test cocaine sample and future larger shipments—loads as large as 1,500 to 1,700 kilograms—and they agreed that a five-kilogram sample would be sent to Miami via a commercial aircraft.  During one meeting attended by the defendant and his brother, the CSes described how they would transport the Cocaine Sample to New York City via suitcases on a commercial airplane.  The defendant asked a number of clarifying questions in the meeting and stated, in sum and substance, that he was prepared to proceed with the plan.  During the meeting, the defendant's brother also told the CSes that he could launder the drug proceeds from the U.S. to Bolivia at rate of 7% of the laundered amount, and from Bolivia to Colombia at a rate of 2% of the laundered amount.  *Id.* at ¶ 15.  Vasquez-Drew also agreed to stamp the cocaine with the letters "SOD" at the CSes' request.  The CSes paid Vasquez-Drew and Londono $15,000 for the sample, and at a subsequent meeting in April 2018, Vasquez-Drew and Londono showed the CSes the bricks of cocaine.  Vasquez-Drew and Londono also advised the CSes that the transport of the cocaine to Miami would cost $30,000 (a rate of $6,000 per kilogram), which included the costs of bribing Bolivian airport officials to facilitate the shipment.

On April 30, 2018, the defendant, his brother, and an unidentified associate met with the CSes in Bolivia to discuss a plan to provide cash to the defendant in New York City.  *Id.* at ¶ 16.

---

[9] Vasquez-Drew was indicted in the Southern District of New York based on his involvement in the conspiracy described herein.  On February 14, 2020, Vasquez-Drew pleaded guilty to conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 812, 959(a), 959(d), 960(a)(3), and 963(b)(1)(B)(ii), and 18 U.S.C. § 3238.  On September 10, 2020, this Court sentenced Vasquez-Drew to 120 months' imprisonment, to be followed by five years' supervised release, and a $45,000 order of forfeiture.  PSR ¶ 7.

They discussed the purity of cocaine to be purchased, how the cocaine was produced, and how the cocaine would be exported from Bolivia. *Id.* CS-1 and the defendant also discussed the price of cocaine in New York City. *Id.* The defendant agreed to assist with the payment related to transporting the purchased cocaine to the U.S. by participating in a money laundering operation in New York City. *Id.*

On May 10, 2018, the defendant met CS-1 in Manhattan, where CS-1 handed the defendant $30,000 in cash. PSR ¶ 17. As depicted below, the defendant counted the cash in front of CS-1 and then called his brother, Ruben, to confirm that he had received the money from CS-1. *Id.* CS-1 agreed to pay a 10% fee for laundering drug proceeds from the U.S. to Colombia. The defendant asked his brother to provide $27,000 to Londono for the payment of the Cocaine Sample and the related transport cost. *Id.* At CS-1's request, the defendant conducted a FaceTime call with Londono to confirm the transaction.



During the May 10, 2018, meeting, the defendant and CS-1 also discussed the details of the larger 1,500-kilogram cocaine load, which was initially addressed during their April 2018 meeting. *Id.* at ¶ 18. The parties discussed the transportation of the Cocaine Sample to Miami, and how it would be delivered, via motor vehicle, to New York City. *Id.* CS-1 indicated that CS-1 had five customers in New York City, who would each receive 1 kilogram of cocaine. *Id.* The defendant conveyed that he needed $30,000 to be made available by CS-1 in Bolivia in order for the Cocaine Sample to be shipped out the next day. *Id.* The defendant demonstrated to CS-1 during the May 10, 2018 meeting that he was familiar with drug trafficking and money laundering prices and concepts. *Id.* The defendant also proposed to CS-1 that CS-1 and the other CSes should work with *him and his brother*, rather than Londono and Vasquez-Drew, regarding drug trafficking and money laundering. *Id.*

Bank records confirm that on May 10, 2018, the defendant made 13 deposits for a total of over $30,000 at an ATM in Manhattan. PSR ¶ 19. The following day, the defendant attempted to wire transfer $28,700 from his Citibank account, but the transfer request was denied by

Citibank.  On May 18, 2018, the defendant transferred $28,500 to his brother in Bolivia.  *Id.*

Despite the $30,000 payment, however, the Cocaine Sample did not arrive in the United States.  *Id.* at ¶ 20.  In July 2018, Londono and others told the CSes that the Cocaine Sample had been stolen by corrupt airport officials in Bolivia.  *Id.*  In September 2018, Vasquez-Drew and his confederates arranged for a replacement sample of 10 kilograms to be shipped.  *Id.* at ¶¶ 20-21.  On September 16, 2018, U.S. Customs and Border Protection agents in Miami seized two suitcases with approximately 10.4 kilograms of cocaine.  *See id.*

On April 25, 2019, the defendant was arrested at Miami International Airport in Miami, after arriving on a commercial flight from Bolivia.  *Id.* at ¶ 25.

### III.   The Southern District of Florida Case

Prior to and separate from the offense conduct described above, the defendant participated in another conspiracy to launder and conceal drug-trafficking proceeds, for which he was ultimately charged and convicted in the Southern District of Florida (the "SDFL Case").[10]

The conduct that formed the basis of the SDFL Case began in or around December 2014, when a confidential source began discussing "money pickup" money laundering contracts with the defendant's brother, Ruben.  *See* Stipulated Factual Proffer, *United States v. Rojas Bascope, et al.*, 19 Cr. 20141, Dkt No. 63, at 1 (attached hereto as Exhibit A).  The contracts involved the confidential source's associates being introduced to other money couriers and then picking up money from them and then depositing and wiring that money to other bank accounts as directed by the defendant's brother, Ruben.  *Id.* at 1-2.  The confidential source then introduced undercover law enforcement officers (the "UCs") to conduct these money pickups.  *Id.* at 2.  Then, on nine occasions between March 2015 and May 2016, the UCs picked up bulk currency from couriers in South Florida and Amsterdam and wired that money to certain bank accounts, including the defendant's bank accounts in New York and bank accounts for the defendant's other brother, Juan.  *Id.* at 2-4.  Bank records indicate that the defendant then wired the proceeds he received to other domestic and foreign accounts.  *Id.* at 4; *see also* Government's Response to Defendant's Objections to Presentence Investigation Report, *Rojas Bascope, et al.*, 19 Cr. 20141, Dkt. No. 70, at 1 ("As part of the concealment of the money, it was broken up and sent to multiple individuals and entities who then wired it to further shell accounts in the United States or abroad.").  In total, the defendant accepted, controlled and then wired approximately $1.7 million in drug trafficking proceeds through his personal New York bank accounts.  *See* Exhibit A at 4.

The defendant was arrested in Miami, Florida in April 2019.  *Id.* at 6.  After his arrest, the defendant waived his *Miranda* rights and told law enforcement, in sum and substance, that "he would wire money for his brother Ruben Rojas through bank accounts and was paid approximately $1,000 for every $100,000 that he wired.  He admitted that he received wire

---

[10] As described herein, the SDFL Case involved a distinct conspiracy that occurred earlier in time and did not overlap with the offense conduct in the instant case.  As such, the SDFL Case does not constitute relevant conduct under U.S.S.G. § 1B1.3.

transfers from third parties . . . and wired those funds to Ruben Rojas in Bolivia. He admitted that the funds he moved for Ruben Rojas were from drug trafficking organizations." *Id.*

## IV. Procedural History

On February 12, 2019, the defendant was charged in Indictment S1 19 Cr. 91 (DLC) (the "Indictment") in the Southern District of New York. The Indictment charged the defendant with (i) conspiring to import five kilograms and more of cocaine into the United States, in violation of Title 21, United States Code, Section 963 ("Count One"); and (ii) conspiring to transmit funds from the United States to Bolivia with the intent to promote specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2 ("Count Two").

On March 12, 2019, the defendant and his two brothers—Ruben and Juan—were charged in the SDFL Case in a four-count indictment with money laundering and conspiracy to commit money laundering. *See Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 3.

As described above, on April 25, 2019, the defendant was arrested in Miami, Florida, in connection with the instant case and the SDFL Case. The United States Attorney's Office for the Southern District of Florida (the "SDFL USAO") proceeded with the SDFL Case and the defendant was presented and arraigned in the Southern District of Florida on April 26, 2019.

On January 7, 2020, the defendant pleaded guilty in the SDFL Case, pursuant to a plea agreement (the "SDFL Plea Agreement"), to one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). *See* SDFL Plea Agreement, *Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 62 (attached hereto as Exhibit B). Under the terms of the SDFL Plea Agreement, which included the benefit of dismissing three of the four charged counts, the SDFL USAO also agreed to recommend a 70-month sentence (*i.e.*, the bottom of the applicable Guidelines range of 70 to 87 months' imprisonment). *See id.* at ¶ 6. The defendant also received a minor participant reduction and the parties agreed that, despite the international fund transfers involved in the SDFL Case, the two-level enhancement for offenses involving sophisticated launder under U.S.S.G. § 2S1.1(b)(3) did not apply to the defendant. *Id.* at ¶¶ 7(d), 8. The SDFL Plea Agreement also stated that the SDFL USAO "does not object to the sentence pronounced for this offense being run concurrent to any sentence pronounced in the offense charged" in the instant case before the Court. *Id.* at ¶ 15.

On August 17, 2020, the defendant was sentenced to 70-months' imprisonment in the SDFL Case. *See* Judgment, *Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 78. At sentencing, counsel for the defendant argued that the court should not consider any conduct from the instant case, as it was "not part of this conspiracy." *See* Sentencing Hearing Tr., *Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 93 at 28-29 (attached hereto as Exhibit C). On August 19, 2020, the parties in the SDFL Case filed a joint motion stating, in part, that pursuant to the SDFL Plea Agreement, "the intent of the parties was that the sentence pronounced in this case would run concurrently with any sentence pronounced in the proceeding pending in the Southern District of New York," and requested that the court amend the judgment to include a provision to that effect. *See* Joint Motion, *Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No.

79. On August 20, 2020, the court amended the judgment to state that the defendant "be imprisoned for a term of seventy (70) months to run concurrent with Southern District of New York Case No. 19-00091-CR-DLC." *See* Amended Judgment, *Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 81.

On May 26, 2021, the defendant pled guilty to Count One of the Indictment in the instant case pursuant to a plea agreement (the "Plea Agreement"). PSR ¶ 6. In the Plea Agreement, the defendant stipulated that the offense conduct involved more than 450 kilograms of cocaine—the highest level available under the Guidelines. *See id.* The Plea Agreement included a Stipulated Guidelines Range of 188 to 235 months' imprisonment. *Id.* The Stipulated Guidelines Range in the Plea Agreement was also based on a Criminal History Category of II, which factored in the defendant's conviction and sentence from the SDFL Case. Consistent with the Plea Agreement, the Probation Office calculates a total offense level of 35, criminal history category of II, and Guidelines range of 188 to 235 months' imprisonment. *Id.* at 22; ¶¶ 46-52.

## DISCUSSION

### I. A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. In particular, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of a Guidelines sentence in this case.

The nature and circumstances of the defendant's offense merit a serious sentence. *See* 18 U.S.C. § 3553(a)(1). The defendant conspired to import thousands of kilograms of cocaine into this country, an amount equal to hundreds of times the five-kilogram quantity of cocaine that suffices to trigger a 10-year mandatory minimum sentence. The defendant and his co-conspirators negotiated in terms of metric tons of cocaine—enough to flood this community for years and place him comfortably, and undisputedly, within the highest bracket of the Guidelines Drug Quantity Table. Few drug-trafficking cases involve such large amounts of cocaine. Indeed, in fiscal year 2020, fewer than 8% of the 15,877 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[11] "[T]he harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160, at 27. "[T]he drugs at issue here cripple individuals and destroy families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (internal quotation marks omitted). Indeed, as the Court recognized at Vasquez-Drew's sentencing, "there's no dispute here that this a very serious crime and with serious consequences and it deserves a significant

---

[11] *See* Use of Guidelines and Specific Offense Characteristics, Guidelines Calculation Based, Fiscal Year 2020, at 27, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf (last visited on September 19, 2021).

sentence." *United States v. Vasquez-Drew*, 19 Cr. 91 (DLC) (Sept. 10, 2020), Sentencing Tr. at 29. Indeed, as Judge Castel noted in another case, the defendant "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, 15 Cr. 125 (PKC), Dkt. No. 83, at 22, 24.

Beyond drug quantity, the sophistication reflected in the defendant's conduct further supports a Guidelines sentence. The defendant played a crucial role in furthering the conspiracy. He was the proverbial "boots on the ground" in New York, accepting payment for the Cocaine Sample that was to serve as the proving ground for future shipments of kilograms of cocaine into New York, and also traveled to and from Bolivia in furtherance of the conspiracy. Not only that, but the defendant sought to transfer the funds to Bolivia using tradecraft honed by a career in money laundering; he sent the money in 13 different transfers to obfuscate the nature of the transaction. By doing so, the defendant demonstrated an intent and a capacity to facilitate large-scale drug trafficking. Put simply, the seriousness of the defendant's conduct merits a Guidelines sentence.

The history and characteristics of the defendant and the need to promote respect for the law also call for a substantial sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant had ample opportunity to lead a law-abiding life. He graduated from high school and attended college in both Bolivia and the United States. PSR ¶¶ 72-74. He also had a close "support network in the U.S." *Id.* at 23. He chose a different, illicit course. Indeed, the defendant's participation in this narcotics importation conspiracy was not a one-time event arising, for example, from a split-second decision made under financial distress. Rather, the defendant's criminal conduct in this case was the product of a series of decisions made over an extended period of time, and it was within his power to stop at any point. Nor was this the defendant's first time conspiring to launder drug-trafficking proceeds. As described above, the defendant pleaded guilty to conspiring to commit money laundering in the SDFL Case and was sentenced to 70 months' imprisonment in that case. In connection with that conspiracy, "a total of $1,733,016 in illegal proceeds were wire transferred into bank accounts controlled and maintained by the defendant." *Id.* at ¶ 49. The defendant's longstanding criminal conduct in distinct conspiracies, which is destructive to society standing alone, is all the more dangerous when it enables other unlawful activity to flourish. Put simply, without people like the defendant to move illegally obtained funds, narcotics trafficking on the scale discussed during this investigation is much more difficult. As such, a serious sentence is necessary to promote respect for the law and to protect the community from the danger he poses.

The need to afford adequate deterrence to the defendant, and to protect the public from other crimes of the defendant, also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(B)-(C). Following the completion of his sentence in the SDFL Case and this case, the defendant will be removed to Bolivia, where he can easily resume supporting money laundering operations, including with members of his family. Indeed, as described above, both this case and the SDFL Case involved the defendant's illegal activities with, among other individuals, his brother Ruben, who remains a fugitive in Bolivia. Moreover, the defendant's abuse of the financial system to further his drug-trafficking activities is not an aberration but, rather, endemic of one of the most serious issues facing American efforts against

cocaine trafficking over the last several decades. *See, e.g.*, *United States v. Rosenthal*, 13 Cr. 413 (JGK), Dkt. No. 266, at 33 ("It's serious because it's a step that aids drug trafficking. It is part of a chain, a link, if you will, which, if you took them away, these various links, the drug traffickers would find it extremely difficult to operate. The whole chain of a drug trafficking operation depends upon various links. This is one of them."). The sentence imposed should therefore demonstrate to the defendant and others similarly situated that cocaine trafficking will not be tolerated, and that individuals who participate in and facilitate such trafficking face significant consequences when they are caught.

## II. THE DEFENDANT'S SENTENCING ARGUMENTS ARE UNPERSUASIVE

The defendant's sentencing submission rests on three primary arguments. First, the defendant attempts throughout his submission to minimize his role in the conspiracy. Second, the defendant argues that the Court should not impose a sentence greater than that imposed on one of his co-conspirators, Vasquez-Drew. And finally, the defendant argues that he has faced unduly harsh conditions while incarcerated during the COVID-19 pandemic and that he poses a low risk of recidivism, thus meriting a below-Guidelines sentence of 120 months' incarceration. Each of these arguments fails.

To start, the defendant seeks to minimize his role in the conspiracy by arguing that he was nothing more than a "money-laundering mule" who did not know "the full scope of the attempted crime until the informant told him." Def. Sentencing Ltr., *United States v. Rojas-Bascope*, 19 Cr. 91 (DLC) (Sept. 16, 2021), Dkt. No. 107, at 4. This argument falls flat. The defendant knew the full scope of the conspiracy because he attended meetings in Bolivia and New York where it was discussed explicitly and, instead of withdrawing from the conspiracy, he took calculated and affirmative steps to ensure that it was successful. As described above, after discussing the details of a 1,500-kilogram cocaine transaction with CS-1, the defendant made thirteen separate bank deposits totaling over $30,000 at an ATM in Manhattan and later wired approximately $28,500 of that money to his brother in Bolivia to pay for the Cocaine Sample. *See* PSR ¶¶ 18, 19. Not only that, but the defendant also sought to cut out Vasquez-Drew and Londono of the drug trafficking operation by telling CS-1, in sum and substance, that CS-1 and other CSes should instead work with him and his brother to sell drugs and launder the proceeds. *See id.* at ¶ 18. Those are not the actions and words of an unwitting participant who was taken advantage of by his brother and other co-conspirators. To the contrary, the defendant knew exactly what he was doing—he chose to participate in a conspiracy to import over 1,500 kilograms of cocaine into the United States and laundered money in furtherance of that conspiracy. To argue otherwise does nothing except show that the defendant has not truly accepted responsibility for his criminal conduct, speaking to the need for a serious sentence to deter future criminal conduct.

Next, the defendant argues that Vasquez-Drew was more culpable than the defendant and, accordingly, the defendant should not receive a sentence greater than the sentence the Court imposed on Vasquez-Drew: 120 months' imprisonment. While it is true that Vasquez-Drew participated in more meetings with the CSes and made more introductions in furtherance of the charged conspiracy, the defendant played a distinct role within the conspiracy—the defendant's absence would have stalled any attempt to transport the Cocaine Sample to the United States. It

is needless, perhaps, then to note that money launderers are critical to the narcotics trade. Moreover, the stipulated Guidelines range for the defendant (188 to 235 months) is higher than the stipulated Guidelines range that was applicable to Vasquez-Drew (135 to 168 months), because (i) Vasquez-Drew was eligible for safety valve relief and thus obtained a two-point reduction in his offense level and (ii) Vasquez-Drew was in a lower criminal history category than the defendant. Here, the defendant's stipulated Guidelines range properly considers not only the massive amounts of cocaine that the defendant conspired to import with Vasquez-Drew and others, but also the defendant's criminal history, which reflects his conviction for a distinct and serious scheme to launder drug trafficking money that took place between 2014 and 2016 in the SDFL Case. Accordingly, that Vasquez-Drew was sentenced to 120 months' imprisonment does not necessitate a substantial downward variance from the defendant's own stipulated Guidelines range, and imposing a sentence within that range does not frustrate the need to avoid unwarranted sentence disparities among defendants.

The defendant also argues for a below-Guidelines sentence in light of the nature of his incarceration, which has included extended periods of lockdown during the COVID-19 pandemic. While the Government certainly recognizes that the COVID-19 pandemic has made incarceration during this time more difficult, the lockdowns at federal prisons were the result of reasonable and temporary steps that the Bureau of Prisons has taken to protect inmates such as the defendant, and they are similar to actions the entire country has taken in order to slow the spread of the virus. Thus, while the Court can properly consider the impact of the pandemic on conditions of confinement in determining the appropriate sentence, the Government respectfully submits that, in light of the seriousness of the defendant's crimes and the other factors described above, a sentence within the stipulated Guidelines range remains appropriate.

Separately, the defendant argues that any sentence imposed in this case should run concurrently with the sentence imposed in the SDFL Case. Although, as noted below, the Government believes that a Guidelines sentence imposed in the instant case to run concurrently with the sentence already imposed in the SDFL Case would be substantial and appropriate, several of the defendant's arguments in support of a concurrent sentence in this case contain legal or procedural misrepresentations which the Government believes must be answered. In his submission, the defendant assumes that, had this Office agreed to a Rule 20 transfer in connection with the SDFL Case, such a transfer "would have guaranteed him concurrent time in two cases and made him safety valve eligible." Def. Sentencing Ltr. at 3. But, of course, the transfer would have provided no such guarantee as this Court has the discretion to order consecutive terms of imprisonment when imposing multiple terms of imprisonment at the same time. *See* 18 U.S.C. § 3584(a).

More importantly, in the defendant's objections to the PSR, the defendant wrongly asserts that the reason the Southern District of New York did not accept the Rule 20 transfer was because "the two districts were angry at each other." PSR at 23. Those characterizations are unfounded and incorrect. As described above, the SDFL Case concerned an investigation led by that District's U.S. Attorney's Office of crimes which began approximately two years before the instant conspiracy and, apart from the inclusion of a single common co-conspirator (the defendant's brother, Ruben), bore no other factual overlap with the conspiracy charged herein. Indeed, by stipulating in the Plea Agreement that he is not eligible for safety valve relief and that

the conviction in the SDFL Case results in three criminal history points, the defendant effectively conceded that the SDFL Case is not relevant conduct under U.S.S.G. § 1B1.3. *See* Plea Agmt. at 2 & n.1. Moreover, counsel for the defendant in the SDFL Case urged the court in that case to ignore the defendant's conduct in the instant case after the Government referred to it at the defendant's sentencing on August 17, 2020, claiming that the conduct charged in the instant case "is not part of [the SDFL Case] conspiracy" and was "irrelevant to the course of the conspiracy before you." *See Rojas Bascope*, 19 Cr. 20141 (JLK), Transcript of Sentencing Hearing, Dkt No. 93 at 28-29.

This Office's rejection of the defendant's Rule 20 transfer proposal—a proposal that would have inured entirely to the defendant's benefit—thus simply reflected the Government's strong interest in allowing the respective U.S. Attorney's Offices to handle the distinct investigations and prosecutions. Indeed, this Office rejected the proposal to have the defendant plead in this District pursuant to a plea agreement that this Office did not negotiate and to proceed to sentencing based on evidence with which this Office was unfamiliar. Under these circumstances, this Office took the position that the prosecution of the SDFL Case should proceed where it was initiated and where the defendant was first arrested—a decision that was wholly within the discretion of this Office to make. *See* Fed. R. Crim. P. 20(a)(2).

Under 18 U.S.C. § 3584(a), "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively." *See also* U.S.S.G. § 5G1.3(d) ("In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."). Where, as here, there is an undischarged term of imprisonment, the Court should consider, among other factors, the factors set forth in Section 3553(a), the type and length of the prior undischarged sentence, and the time served on the undischarged sentence. *See* U.S.S.G. § 5G1.3, Application Note 4.

As described above, the amended judgment in the SDFL Case stated that the 70-month sentence would run concurrently with any sentence imposed in the instant case. *See Rojas Bascope, et al.*, 19 Cr. 20141 (JLK), Dkt. No. 81. The Government does not believe that the amended judgment in the SDFL Case binds this Court, and as described above, believes that the offense conduct in the SDFL Case was distinct from the conduct here, such that it does not qualify as relevant conduct under U.S.S.G. § 1B1.3. Nevertheless, in consideration of the 3553(a) factors, which provide the appropriate guidance, and given the substantial sentence that the Government believes is appropriate under the applicable Guidelines range, the Government does not object to the defendant's request that any sentence imposed run concurrent to the 70-month sentence from the SDFL Case.[12]

---

[12] As set forth in the PSR, the Probation Department has recommended a sentence of 168 months' imprisonment to run concurrently with the defendant's undischarged prior term of imprisonment in the Miami case. *See* PSR at 24.

### III.     THE COURT SHOULD IMPOSE $45,000 IN FORFEITURE

The Court should require the defendant to forfeit the $45,000 the CSes paid in connection with the cocaine samples.

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States* v. *Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States* v. *Monsanto*, 491 U.S. 600, 607 (1989). The purpose of forfeiture is "punitive rather than restitutive," *United States* v. *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States* v. *Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

The defendant admitted to the forfeiture allegations in the Indictment pursuant to his plea agreement. PSR ¶ 108. In connection with the Cocaine Sample, CS-1 handed the defendant's co-conspirator, Vasquez-Drew, $15,000 in Bolivia and CS-1 then paid $30,000 to the defendant in New York. 18 U.S.C. § 981(a)(2)(A) ("[T]he term 'proceeds' . . . is not limited to the net gain or profit realized from the offense."). Accordingly, the Court should require the defendant to forfeit these funds.

### IV.     THE COURT SHOULD IMPOSE A GUIDELINES FINE

The Court should also impose a fine within the stipulated Guidelines range of $40,000 and $10 million. *See* PSR ¶ 103.

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

The defendant has not met his burden of establishing that he is unable to pay a fine. The defendant has a net worth of more than $94,000 and has retained counsel. *United States v. Corace*, 146 F.3d 51, 57 (2d Cir. 1998) (noting that a defendant was "represented by retained counsel" in assessing whether a fine was appropriate). On the other hand, while the Government is not required to establish that the defendant can pay a fine, his history of lucrative large-scale drug trafficking and money laundering, and his ability to pay for travel to meetings with the CSes in Bolivia suggest that he has the means to do so. *See United States v. Orena*, 32 F.3d 704, 716, (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine . . . ."). Accordingly, in light of the defendant's failure to meet his burden on this issue, the balance of the Section 3553(a) considerations described herein warrant the imposition of a fine within the Guidelines range that will serve as not only appropriate additional punishment, but also as a critical component of the general deterrence message resulting from the upcoming sentencing.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration within the Guidelines range of 188 to 235 months' imprisonment, forfeiture in the amount of $45,000, and a fine within the Guidelines range of $40,000 and $10 million.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: /s/
Sam Adelsberg
Matthew Hellman
David Robles
Assistant United States Attorneys
(212) 637-2494 / 2278 / 2550

Enclosure

cc:   Defense Counsel (by ECF)